UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TERESA C. SMITH, O/B/O G.J.S.,[1]

                              Plaintiff,

                                                        **REPORT AND**
                                                        **RECOMMENDATION**

          v.
                                                        13-CV-1125-RJA

CAROLYN W. COLVIN,[2]
ACTING COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

## INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b)

(Dkt. No. 10). Pending before the Court is a motion for judgment on the pleadings by plaintiff

Teresa C. Smith ("Smith") (Dkt. No. 8).

Smith argues that the Acting Commissioner of Social Security ("Commissioner") erred in

determining that Smith's minor child, G.J.S., is not eligible for Supplemental Security Income

("SSI") benefits under the Social Security Act ("Act"). Smith contends that the Administrative

Law Judge ("ALJ") ignored one of the two teacher assessments in the record, and that the

ignored assessment should have received substantial weight. Smith also argues that the ALJ

subjectively gave different weight to different portions of G.J.S.'s child psychologist's record

without justification. Following from the preceding arguments, Smith concludes that the ALJ

elevated his own judgment over that of G.J.S.'s teachers and psychologist.

---

[1] Fed. R. Civ. P. 5.2(a)(3) states that unless otherwise ordered by the court, a minor's name should be replaced with his initials.
[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Carolyn W. Colvin for Michael J. Astrue as Acting Commissioner of Social Security.

The Commissioner urges the Court to uphold the denial of SSI benefits. The Commissioner argues that the ALJ did, in fact, review all teacher records and assign them appropriate weight. The Commissioner further argues that the ALJ properly gave more weight to the psychologist's signed treatment notes than to an unsigned report prepared by the psychologist's office.

The Court has deemed the motions submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court respectfully recommends denying Smith's motion. Although the Commissioner did not file a cross-motion for judgment on the pleadings and shall be required to explain why to the District Judge, the Court finds that the same facts warranting a denial of Smith's motion warrant judgment on the pleadings for the Commissioner. Every issue that would support judgment for the Commissioner has been briefed by the parties. See Gjeci v. Comm'r of Social Security, No. 13–cv–WL 34082636539 (KBF), 2014 WL 3408263 (S.D.N.Y. July 7, 2014); Salter v. Astrue, No. 4:12CV888, 2013 WL 8171789 (N.D. Ohio June 27, 2013.). Accordingly, the Court recommends granting judgment to the Commissioner and closing the case.

## PROCEDURAL BACKGROUND

Smith filed an application for SSI benefits on behalf of G.J.S., a child under the age of 18, on August 27, 2010. (Certified Administrative Record at 147−50, hereinafter designated as [147−50.]). The application was initially denied on July 9, 2010. [104−06.] Smith filed a written request for a hearing on December 3, 2010. [48−96.] ALJ William Weir held a hearing on February 17, 2012. [48−96.] In a decision dated May 24, 2012, the ALJ found that G.J.S. was not disabled. [26−47.] Specifically, the ALJ found that:

1. The claimant was born on July 28, 2004. Therefore she was a school-age child on August 27, 2010, the date the application was filed, and is currently a school-aged child (20 CFR 416.926a(g)(2)).
2. The claimant has not engaged in substantial gainful activity since August 27, 2010, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).
3. The claimant has attention deficit hyperactivity disorder, Type I diabetes mellitus, asthma, obesity, and anxiety, and major depressive disorders, each of which constitutes severe impairment (20 CFR 416.924, 416.935 and 416.926).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.92(a)).

[32.]

On September 25, 2013, the Appeals Council denied Smith's request to review the ALJ's decision. [1−6.] ALJ Weir's decision became the final decision of the Commissioner. See 20 C.F.R § 416.1481. Smith commenced this action on G.J.S.'s behalf by filing a Complaint on November 15, 2013. (Dkt. No. 1.)

## ADMINISTRATIVE RECORD

When Smith applied for SSI, she reported that G.J.S., born July 2004, had the following disabilities: (1) asthma; and (2) type-one diabetes. [167.] According to Smith, G.J.S. took insulin shots four times a day. [159.]

## FACTUAL BACKGROUND

### Education Records

With the exceptions of Math and Character, G.J.S. earned either "satisfactory" or "outstanding" grades in all subjects during the first semester of the 2011−2012 academic year. [213.] Teachers commented that G.J.S. performed "excellent work" in English Language Arts ("ELA") and a "good job" in Science, Expedition, Music, and Art. [213.]

In Math, G.J.S. earned an "unsatisfactory" grade of 58. [213.] In Character, G.J.S. earned a "needs improvement." [213.] It was noted by G.J.S.'s teachers that G.J.S. "is missing math assignments," has "[p]oor quiz/test scores [that] have lowered [her math] grade," and is "often talkative during [gym] classroom instruction." [213.]

## Teacher Assessments

Mrs. Camacho, G.J.S.'s first grade teacher, completed a questionnaire dated September 15, 2010. [175−83.] Ms. Stevener, G.J.S's second grade teacher, submitted a more recently completed teacher questionnaire on January 11, 2012. [216−24.] Through these teacher assessments, Mrs. Camacho and Ms. Stevener evaluated G.J.S.'s functioning.

### Format and Content of Teacher Assessment

The teacher questionnaire is a form distributed to G.J.S.'s teachers by the New York Office of Temporary and Disability Assistance, Division of Disability Determinations. [175.] The form asks teachers to "compare this child's functioning to that of same-age children who do not have impairments." [176.] The form asks about a child's functioning in the following domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Himself or Herself; and (6) Medical Conditions and Medications/Health and Physical Well-Being. [175−83; 216−24.]

To complete the form, the teachers were required to either check a block indicating "NO problems observed in this domain, functioning appears age-appropriate, "or (2) indicate that "the child has problems functioning in [a given] domain" by using a ranking scale in various areas within a given domain. [175−83; 216−24.]

<u>Mrs. Camacho</u>

Mrs. Camacho, G.J.S.'s first grade teacher, completed a questionnaire dated September 15, 2010. [175−83.] Mrs. Camacho indicated that she had known G.J.S. for one month, taught G.J.S. in all subjects, and that there was no unusual degree of absenteeism. [176.]

Mrs. Camacho indicated G.J.S. did not have a problem acquiring and using information. [177.]

Mrs. Camacho indicated that G.J.S. had problems in attending and completing tasks. [178.] Specifically, G.J.S. had obvious problems in terms of her ability to change from one activity to another without being disruptive, and her ability to complete work accurately without distracting herself or others. [178.] G.J.S. had a serious problem, which manifested daily, in regards to her ability to work without distracting herself or others. [178.] G.J.S. had slight problems, occurring monthly, in all other areas of attending and completing tasks. [178.]

Mrs. Camacho also indicated that G.J.S. had problems in interacting and relating with others. [179.] G.J.S. had an obvious problem, manifested daily, playing with other children. [179.] G.J.S. had obvious problems, manifested monthly, seeking attention appropriately, expressing anger appropriately, and interpreting meaning of facial expression, body language, hints, and sarcasm. [179.] G.J.S. had an obvious problem, manifested on a weekly basis, in regards to asking permission appropriately. [179.] G.J.S. had a serious problem, manifested on a weekly basis, following classroom rules. [179.] Mrs. Camacho noted that G.J.S. was on an individually color coded behavior plan, does best with positive reinforcement, and is able to do activities independently, but sometimes refuses to do them. [179.]

Mrs. Camacho also indicated that G.J.S. had problems moving about and manipulating objects. [180.] G.J.S. had a serious problem in regards to her ability to move her body from one

place to another (e.g., standing, balancing, shifting weight, bending, kneeling, crouching, walking, running, jumping, climbing), as well as with her ability to manage the pace of her physical activities. [180.] G.J.S is overweight, which caused her some difficulties in doing activities with her peers on the floor, as well as any physical activities outdoors or as part of physical education. [180.] G.J.S. is accommodated with chairs or special seating postures during gym calls or when her regular class is doing activities on the floor. [180.]

Lastly, Mrs. Camacho indicated that G.J.S. had problems caring for herself. [181.] G.J.S. had obvious and daily problems in five of ten areas within this domain. [181.] G.J.S. must take insulin daily with the nurse, and she gives the nurse a hard time. [181.] Mrs. Camacho, at times, held G.J.S.'s hand to ensure that the nurse could administer the insulin. [181.]

Mrs. Camacho noted that G.J.S. was a wonderful student who needed some extra assistance to be healthier and get back on track with her health and academics. [183.]

<u>Ms. Stevener</u>

Ms. Stevener, G.J.S's second grade teacher, submitted a teacher questionnaire on January 11, 2012. [216 −17.] Ms. Stevener indicated that she had known G.J.S. for four years and saw G.J.S. every day (8:55 a.m. to 3:05 p.m.) for every subject. [217.]

Ms. Stevener indicated that G.J.S. had obvious problems with comprehending and doing math problems, and applying problem solving skills in class discussions. [218.] According to Ms. Stevener, G.J.S. was very independent in reading and writing and could write a paragraph without help at a second grade level. [218.] However, G.J.S. needed to memorize addition and subtraction problems, and rarely completed her homework, which when completed, appeared rushed. [218.]

Ms. Stevener also indicated G.J.S. had very serious and daily problems in regards to attending and completing tasks in the context of homework assignments. [219.] G.J.S. had serious and daily problems in the ability to focus long enough to finish assigned activities or tasks, as well as her ability to change activities without being disruptive. [219.] G.J.S. had obvious problems in regards to her ability to pay attention when spoken to directly, to refocus, or to carry out multi-step instructions, and to work at a reasonable pace to finish on time. [219.] G.J.S. works better independently, as she struggled with groups due to her constant talking and lack of focus. [219.] G.J.S. rarely completed her homework. [219.]

Ms. Stevener indicated that G.J.S. had slight problems in her ability to interact and relate with others, [220] her ability to move about and manipulate objects, [221] and her ability to care for herself. [222.]

Ms. Stevener also noted the following. G.J.S. took her medication on a regular basis. [223.] When G.J.S.'s sugar was off G.J.S. had trouble paying attention. [223.] G.J.S.'s sugar was not taken care of at home and G.J.S. indicated that her mother gave her whatever she wanted to eat. [223.] G.J.S.'s mother, according to Ms. Stevener, sent G.J.S. to school with candy and chips that G.J.S. cannot have. [224.] As a result, there were problems for the school nurse and for G.J.S.'s academic performance. [223.]

School officials often had to confiscate candy and chips from G.J.S. [224.] According to G.J.S.'s mother, G.J.S. gets the candy and chips from other children on the bus. [61−62.]

### Medical Background

On August 25 and 26, 2010, G.J.S. was hospitalized at Women & Children's Hospital of Buffalo ("Children's Hospital") after several weeks of increased thirst and increased urination.

[240−61; see also 285−376.] The record indicates G.J.S. had asthma treated by occasional albuterol use. [241.] New onset type-one diabetes was diagnosed. [240.]

G.J.S. was seen on September 22, 2010 at Children's Hospital. [262−65; see also 414−15.] The doctor noted that G.J.S. was on Lantus and Humalog for her newly diagnosed diabetes, and she was "doing fine." [262.] G.J.S.'s Lantus injections were increased to 15 units. [415.]

On November 9, 2010, a medical consultant, J. Meyer, reviewed the relevant medical evidence and offered a non-examining review opinion at the behest of the Commissioner. [270−75.] He opined that G.J.S. did not have a "marked" limitation in any functional domain. [272.]

On January 12, 2011, G.J.S. saw Dr. John Buchlis at Children's Hospital. [406−07.]  Dr. Buchlis noted that G.J.S. was treated for an ear infection three months earlier, and was complaining of aching in the left ear. [406−07.] Dr. Buchlis also noted that G.J.S. was receiving counseling for depression-anxiety. [406.] Dr. Buchlis's assessment was type-one diabetes, overweight, and possible anxiety-depression. [407.] The doctor increased G.J.S.'s Lantus dosage and asked Smith to make sure G.J.S. adhered to her meal plans. [407.] Smith was also told to call if the pain in G.J.S.'s ear did not improve in two days. [407.]

On February 3, 2011, Smith took G.J.S. to Monsignor Carr Mental Health Services ("Monsignor Carr"), and reported that the child talked back to Smith and was disruptive during school. [394.] G.J.S. was scheduled for individual and family therapy to rule out attention deficit hyperactivity ("ADHD"). [394.]

On March 1, 2011, Monsignor Carr drafted an initial plan for G.J.S. [394.] G.J.S. was assessed with a GAF of 45. [394.][3]

---

[3] GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

On April 13, 2011, G.J.S. saw a resident physician, Dr. Johnson, and Dr. Buchlis at Children's Hospital. [400–03.] Dr. Johnson indicated that G.J.S.'s diabetes was poorly controlled with high blood glucose most of the time. [400.] According to Dr. Johnson, Smith did not consistently give G.J.S. her insulin. [400.] Dr. Johnson stated that G.J.S. was obese but in no appreciable distress. [400.] Dr. Johnson's assessment was type-one diabetes–poorly controlled, overweight, anxiety/depression, and nocturnal enuresis. [401.] Dr. Johnson planned to increase G.J.S.'s dosage of Lantus and seek a social work consultation for neglect of treatment. [401.]

On May 18, 2011, G.J.S. reported to Dr. Jaime Pabilonia, a child psychiatrist. [390.] Smith complained that G.J.S. was disruptive, did not follow directions, mouthed off, and did not listen to her mother. [390.] G.J.S. was arguing with her step-brother and was noted to have a "difficult time accepting" her diagnosis of diabetes. [390.] G.J.S. was also noted to have difficulty sitting in class. [390.] According to Smith, G.J.S. has threatened to hurt herself and has picked up knives when she was upset. [390–91.] Dr. Pabilonia noted that G.J.S. looked physically healthy, although she was diabetic and taking medication. [391.] Dr. Pabilonia also observed that G.J.S. appeared to have good intelligence, and responded to questions appropriately. [391.] G.J.S. was coherent, and Dr. Pabilonia noted that G.J.S. helped doing the genogram. [391.] G.J.S. acknowledged that she did not get along with her brother and fought him, but got along with her mother and father. [391.] Dr. Pabilonia diagnosed G.J.S. with ADHD, adjustment disorder with mixed disturbance of conduct and emotion, as well as sibling relations problem. [391.] Dr. Pabilonia mentioned that G.J.S. communicated very well and was

---

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") (4th ed. Rev. 2002), *available at* LEXIS (section titled "Multiaxial Assessment"). A GAF in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. However, a GAF score "is not dispositive of disability, but merely one piece of evidence that the ALJ may consider in drawing [his] conclusion." Santiago v. Colvin, No. 12-7052, 2014 WL 718424, at *20 (S.D.N.Y. Feb. 25, 2014).

of at least average intelligence. [391.] Dr. Pabilonia also noted that G.J.S. can be impulsive and became depressed easily because of family problems and her diabetes. [391.] Dr. Pabilonia prescribed Focalin for G.J.S.'s ADHD symptoms, and asked Smith to return in one month. [391.]

On May 25, 2011, G.J.S. was taken for therapy and Monsignor Carr issued a comprehensive treatment plan. [389.] G.J.S. was noted to be disruptive, and did not follow directions. [389.] G.J.S. was also mouthy and did not listen to her mother and father. [389.] G.J.S. threatened to hurt herself when she became angry and had difficulty dealing with her siblings and with authority figures. [389.] G.J.S. was diagnosed with ADHD, and adjustment disorder with mixed disturbance of mood and conduct and a sibling relational problem. [389.] G.J.S. was assessed to have a GAF of 45. [389.]

On June 15, 2011, G.J.S. reported to Dr. Pabilonia, who noted that G.J.S. was defiant and disrespectful during the session. [388.]

On July 13, 2011, Smith took G.J.S. to Children's Hospital and saw Dr. Buchlis. [398−99.] Smith reported that G.J.S. experienced hyperglycemia throughout the day, but denied hospitalizations, emergency room visits, and hypoglycemia. [398−99.] Smith acknowledged difficulty in counting carbohydrates and sometimes missing insulin treatments. [398−99.] Smith stated that G.J.S.'s father treated G.J.S. during the day, and Smith did not know whether the father also missed treatments. [398.] Dr. Buchlis noted that G.J.S. was active, obese, and in no appreciable distress. [398.] Physical examination findings were normal. [398−99.]  Smith and G.J.S. were counseled about insulin treatment and counting carbohydrates. [399.] Dr. Buchlis diagnosed type-one diabetes, which was poorly controlled, and hyperglycemia throughout the day, most likely due to missing insulin dosage. [399.] Dr. Buchlis also discussed the importance of compliance to G.J.S.'s treatment plan and explained to Smith that Child Protective Services

may have to be contacted if G.J.S.'s diabetes remained poorly controlled or if there is no compliance with G.J.S.'s treatment plan. [399.]

On July 15, 2011, G.J.S. reported to Dr. Pabilonia. [387.] Dr. Pabilonia noted G.J.S. did not appear for an appointment one month earlier and that Smith related she had run out of Focalin. [387.] Dr. Pabilonia noted that G.J.S. was alert, pleasant, and cooperative, maintained good eye contact, and seemed smart. [387.] G.J.S. related that she swims daily in her family pool. [387.] The doctor noted that laboratory results showed G.J.S.'s blood sugar was high. [387.] Smith was asked to return on August 12, 2011. [387.]

On July 31, 2011, G.J.S. and Smith reported to Children's Hospital for diabetes care. [396.] G.J.S. was on Humalog and Lantus insulin. [396.] G.J.S. had asthma. [396.] G.J.S. had also been experiencing blurred vision. [396.] She had been having hyperglycemia throughout the day, and sometimes missed an insulin dose with her snacks during the day. [398.] The assessment was that her type-one diabetes was poorly controlled. [399.]

Smith returned to Dr. Pabilonia without G.J.S. on August 12, 2011. [386.] Smith reported that G.J.S. would sometimes spit out the medication, and reported that G.J.S. continued to be mouthy. [386.]

On August 23, 2011, Monsignor Carr released an updated treatment plan. [385]. It was noted that G.J.S. was mouthy and did not listen to her mother. [385.] It was further noted that G.J.S. was disruptive, did not follow directions, and had low self-control. [385.] Monsignor Carr assessed G.J.S. with ADHD, and adjustment disorder with mixed disturbance of mood and conduct and a sibling relational problem. [385.] G.J.S. was again assessed with a GAF of 45. [385.] Much of this assessment is difficult to read. [385.]

On August 26, 2011, G.J.S. saw Dr. Robert Salis to get immunization shots and a physical examination for school. [378−79.] Dr. Salis stated that G.J.S. was doing well and going to Children's Hospital every three months for endocrine checkup. [379.] Smith reported that G.J.S. was exhibiting socially appropriate behavior, exercising occasionally by doing "light activity," and passing in school at the age-appropriate grade level. [378.] G.J.S. stood 47 inches and weighed 77 pounds. [378.] Physical examination revealed normal findings, including an examination of G.J.S.'s lungs, which were clear. [379.] Dr. Salis's assessment was diabetes, obesity, and asthma mild and persistent. [379.]

On October 5, 2011, G.J.S. reported to Dr. Pabilonia at Monsignor Carr. [384.] Dr. Pabilonia's notes indicate that G.J.S.'s step-siblings also had mental health issues, which were being treated at Monsignor Carr. [384.] G.J.S. said that she did not read well, but was noted to be doing well on her medication otherwise. [384.]

On November 8, 2011, G.J.S. returned to Dr. Pabilonia. [383.] Dr. Pabilonia noted that G.J.S. had not been suspended recently, although she had been suspended twice since September for talking too much. [383.] He diagnosed ADHD, and noted that G.J.S.'s insurance would not pay for Focalin. [383.] He switched her to Adderall as a result. [383.] The doctor noted that G.J.S. maintained good eye contact, wrote her name very nicely, and was aware of the date and where she lived. [383.]

On November 28, 2011, Monsignor Carr released an updated treatment plan. [382.] G.J.S. was noted to be mouthy and did not listen to her mother. [382.] G.J.S. wanted to control the therapeutic sessions and seemed quite controlling at home in regards to her parents and siblings. [382.] G.J.S. had a difficult time sitting down and switching from one activity to the next activity. [382.] G.J.S. was assessed with ADHD, adjustment disorder with mixed

disturbance of emotion and assigned a GAF of 47. [382.] Barriers to treatment were noted to include the fact that G.J.S. did not want to listen and was very controlling. [382.]

On December 13, 2011, G.J.S. reported to Dr. Pabilonia. [381.] Dr. Pabilonia diagnosed ADHD and prescribed Adderall. [381.]

On January 13, 2012, Dr. Salis saw G.J.S. for constipation and rectal bleeding and because G.J.S. needed to refill her inhalers. [423−25.] Dr. Salis examined G.J.S. and found she had lost 4.5 pounds, and physical examination produced normal findings. [424.] Dr. Salis's assessment was constipation and asthma−mild and persistent. [424.] Dr. Salis advised that G.J.S. use Albuterol puffs as needed. [424.] The doctor also stated that her diet needed to be changed in consultation with an endocrinology weight loss plan. [424.]

In a letter dated January 18, 2012, Dr. Buchlis reported that he saw G.J.S. at his pediatric endocrinology/diabetes practice. [417−19.] Dr. Buchlis's physical examination findings were normal. [416.] Dr. Buchlis further found that G.J.S.'s mood was normal and that her glycosylated hemoglobin ("HbAlC") had improved, but was still elevated. [419.] Dr. Buchlis advised Smith to check G.J.S.'s blood sugar before snacking. [419.]

### February 1, 2012 Assessment from Dr. Pabilonia's Office

The record contains a questionnaire dated February 1, 2012, and stamped with Dr. Pabilonia's name. [427−30.] The ALJ noted that Smith submitted an assessment under the stamp of Dr. Pabilonia but without a signature. [35, referring to 430.]

The form has boxes checked indicating that: G.J.S. often failed to pay close attention to details; had difficulty sustaining attention in work and play; did not seem to listen when spoken to directly; often did not follow through on instructions and failed to finish tasks; often had difficulty organizing tasks and activities; often avoided, disliked, or reluctantly engaged in tasks

requiring sustained mental effort; often lost things; was easily distracted by extraneous stimuli; and was often forgetful. [428.] The form has a circle around the word "extreme" indicating that G.J.S. exhibited impairment in age-appropriate cognitive and communicative functioning. [428.] The word "extreme" was also circled in response to questions concerning difficulties in age-appropriate social functioning and difficulties in maintaining concentration, persistence or pace. [428.] The word "mild" was circled in response to a question asking about G.J.S.'s age-appropriate personal functioning. [428.] The form also indicated that G.J.S. has: (1) marked limitation for social functioning [428−30]; (2) mild limitation for personal functioning self-care [430]; (3) moderate limitation for acquiring and using information [428−30]; and (4) extreme limitation in: (a) deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; (b) attending and completing tasks; (c) interacting and relating with others; and (d) caring for self. [428−30.] Comments on the form indicate that G.J.S. is "very hyper, distracted, and do [sic] follow rules at home and school. [430.] Claimant is disruptive, mouthy and do [sic] not listen to mother and authority figures." [430.]

## **STANDARD OF REVIEW**

The only issue to be determined by this Court is whether the ALJ's decision that G.J.S. was not disabled is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

To qualify for Social Security Insurance and disability insurance benefits under the Social Security Act, a child under 18 must have a "medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i).

There is a three-step evaluation to determine disability for children: (1) whether the child is engaged in work that constitutes "substantial gainful activity"; (2) whether the child suffers from at least one "severe" medically determinable impairment that causes "more than minimal functional limitations"; and (3) whether the impairment is a medical or functional equivalent of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P. App. 1. See 20 C.F.R. § 416.924(b)-(d).

Functional equivalence is demonstrated only if the child exhibits "extreme" limitation in one, or "marked" limitation in two, of the following six "domains" established by the regulations: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself and others; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A "marked" limitation must "seriously" interfere with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(a)(e)(2). An "extreme" limitation is reserved only for the worst limitations that "very seriously" interfere with a claimant's ability to independently imitate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

## **DISCUSSION**

The first two steps of the three-step evaluation to determine disability for children are not in dispute. This Court will therefore focus solely on the third step of the three-step evaluation.

### **The ALJ properly used teacher assessments in his determination that G.J.S. is not eligible for SSI benefits under the Act.**

Smith argues that the ALJ erred because he ignored a teacher questionnaire completed by Mrs. Camacho. Smith infers an oversight of Mrs. Camacho's report from the lack of any specific

reference to Mrs. Camacho in the ALJ's decision. The Commissioner counters that the ALJ must have considered Mrs. Camacho's report because there are only two teacher reports in the record and the ALJ uses the plural tense when referring to "teachers" and "reports."

The ALJ's use of plural "teachers" and "reports" suggests both the report submitted by Mrs. Camacho and the report submitted by Ms. Stevener were reviewed by the ALJ. Further, "lack of reference to specific record evidence may not warrant remand standing alone." Williams v. Colvin, No. 3:11–cv–1134–J–TEM, 2013 WL 1320419, at *4 (M.D. Fla. Mar. 29, 2013). The fact that the ALJ does not specifically reference Mrs. Camacho's teacher assessment does not alone require remand.

Smith also argues that even if the ALJ considered both Mrs. Camacho's and Ms. Stevener's reports, the ALJ erred because he did not resolve material conflicts between Mrs. Camacho's and Ms. Stevener's reports. Smith asserts that there is a material conflict between the two reports because Ms. Stevener found slight or no problems in the domain of interacting and relating to others, while Mrs. Camacho found serious and obvious problems in that domain.

The Commissioner responds that emphasis of Ms. Stevener's assessment over that of Mrs. Camacho's assessment was entirely reasonable, as Ms. Stevener taught G.J.S. more recently and for four years while Mrs. Camacho only taught G.J.S. for one month. The Commissioner further asserts that Smith did not show how either teacher assessment equates to a finding of marked or extreme limitation in any domain.

For opinions from non-medical sources such as teachers, the ALJ should consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with

other evidence, and any other factors that tend to support or refute the allegations. 20 C.F.R. § 404.1527(c)(2)-(6); SSR 06-03P (S.S.A.), 2006 WL 2329939 at 4–5.

The preceding factors represent basic principles that apply to the consideration of all opinions from medical sources that are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in her professional capacity. SSR 06-03P (S.S.A.), 2006 WL 2329939, at 4–5.

The ALJ must provide "good reasons for the weight given to the treating source's opinion." Petrie v. Astrue, 412 Fed. App'x 401, 407 (2d Cir. 2011) (summary order) (internal citations omitted). "Nevertheless, where the evidence of record permits [the Court] to glean the rationale of an ALJ's decision," it is not necessary that the ALJ "[mention] every item of testimony presented to him or [explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Id. (internal quotation marks and citation omitted).

Applying these factors shows that the ALJ properly used the teacher assessments provided by Ms. Stevener and Mrs. Camacho in his determination that G.J.S. is not eligible for SSI benefits under the Act. The ALJ sufficiently explained his reasons for "[giving] great weight to Ms. Stevener's report." [36.]

## Nature and Extent of the Relationship

Both Ms. Stevener and Mrs. Camacho taught G.J.S. every day and in every subject. [176, 217.] However, the length of Ms. Stevener's relationship with G.J.S. is much greater than the length of Mrs. Camacho's relationship with G.J.S. Mrs. Camacho knew G.J.S. for one month at the time she completed the assessment. [176.] Ms. Stevener knew G.J.S. for four years at the time at the time she completed the assessment. [217.]

In his decision, the ALJ acknowledged the great extent of the relationship between Ms. Stevener and G.J.S. and stated that he, in part, "[gave] great weight to Ms. Stevener's report [because she had] more extensive contact with the claimant than any other professional." [36.]

### Teacher Qualifications

In his decision, the ALJ gave "[great] weight to the reports by the claimant's teachers, who are trained in childhood education and behavior patterns and who spend long periods of time with the claimant." [35.] Ms. Stevener's and Mrs. Camacho's training qualifies them to assess G.J.S.'s functioning.

Ms. Stevener was able to observe G.J.S. for a longer period of time than Mrs. Camacho and, therefore, Ms. Stevener's report reflects a greater understanding of G.J.S.'s functioning.

### Teacher's Area of Specialty or Expertise

As previously stated, the ALJ attributed the great weight he assigned to Ms. Stevener's report, in part, due to her "train[ing] in childhood education and behavior patterns." [35−36.] As Ms. Stevener was able to observe G.J.S. for a longer period of time than Mrs. Camacho, Ms. Stevener's report reflects a greater understanding of G.J.S.'s functioning.

### Degree to which Teachers Present Relevant Evidence

Teacher assessments provided by both Ms. Stevener and Mrs. Camacho directly address the six "domains" established by the regulations in determining the functional equivalency of a child. See 20 C.F.R. § 416.926a(b)(1). However, several factors increase the degree of relevance of Ms. Stevener's assessment and decrease the relevance of the evidence provided by Mrs. Camacho.

The ALJ considered the detail of the report provided by Ms. Stevener. He describes Ms. Stevener's report as a "much more detailed report than any received from [G.J.S.'s doctors]." [36.] The ALJ subsequently used the information provided by Ms. Stevener to conclude that G.J.S. is not eligible for SSI benefits under the Act, as her impairment is neither a medical nor functional equivalent of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P. App. 1. [35–43.]

Additionally, the ALJ states that he gave "great weight" to Ms. Stevener's report because she was "trained in childhood education and behavior patterns, in addition to having more extensive contact with the claimant than any other professional." [36.] Again, the length of the relationship between G.J.S. and Ms. Stevener, who taught G.J.S. for four years, is greater than the length of the relationship between G.J.S. and Mrs. Camacho, who taught G.J.S. for only one month, at the time the teacher assessments were completed. [176; 217.] The length of her relationship with G.J.S. allows Ms. Stevener to provide a more complete assessment of G.J.S.'s functioning than Mrs. Camacho.

Further, as described above, Ms. Stevener provided a more recent assessment of G.J.S.'s functioning than Mrs. Camacho. Mrs. Camacho, G.J.S.'s first grade teacher, completed a questionnaire dated September 15, 2010. [175–83.] Ms. Stevener, G.J.S's second grade teacher, submitted her teacher questionnaire on January 11, 2012. [216–24.] The more recent completion date of Ms. Stevener's assessment increases the degree of relevance in analyzing G.J.S.'s functioning, as it provides a more current evaluation of G.J.S.'s functioning.

<u>Consistency with Other Evidence</u>

Ms. Stevener's teacher assessment is consistent with the other evidence regarding the functioning of G.J.S. As noted by the ALJ:

Ms. Stevener's comments regarding the claimant's mother failing to properly and consistently deal with the claimant's treatment for her diabetes mellitus are consistent with the reports from other treating sources. Exhibits 14F, p.5 [399]; 14F, p.6 [400]; 5F, p.2 [267], all reflect non-compliance, inconsistencies, and failure to provide home test results requested by treating sources.

[36−37.]

The consistency of Ms. Stevener's teacher assessment with reports from other treating sources support the ALJ's proper use of the teacher assessments in his determination of G.J.S.'s ineligibility for SSI benefits.

Smith's argument that Ms. Stevener's and Mrs. Camacho's report are materially conflicting is unavailing. As previously stated, Smith asserts that there is a material conflict between reports since Ms. Stevener found slight or no problems in interacting and relating to others, while Mrs. Camacho found serious and obvious problems in that domain. However, Smith has not shown that Ms. Camacho's opinion would equate to a finding of marked or extreme limitation in any domain. Moreover, the ALJ acknowledged that G.J.S. had difficulty in interacting and relating to others, and noted Ms. Stevener's opinion that G.J.S. had little difficulty in the domain. [39, referring to 220.] The ALJ did not err because he acknowledged evidence in the record showing that G.J.S. had difficulty in the domain and subsequently explained why the difficultly did not represent a marked limitation.

In sum, substantial evidence supports the ALJ's consideration and weighing of the two teacher reports in the record.

**The ALJ properly gave more weight to a series of reports prepared by Dr. Pabilonia, a child psychologist treating G.J.S., and to a teacher evaluation prepared by Ms. Stevener, G.J.S.'s teacher, than to a medical report completed by Dr. Pabilonia's office in February 2012.**

Smith argues that the ALJ erred in his decision by giving more weight to a series of reports prepared by Dr. Pabilonia, a child psychologist treating G.J.S., and to a teacher

evaluation prepared by Ms. Stevener, G.J.S.'s teacher, than to an unsigned medical source report completed by Dr. Pabilonia's office in February 2012. Smith implies that the unsigned report should receive equal or more weight because the report is from a treating physician. The Commissioner responds that the ALJ was justified in giving little to no weight to the February 2012 assessment from Dr. Pabilonia as: (1) the ALJ is not required to give controlling weight to a medical source opinion that is based on a claimant's subjective complaints and is not well supported; and (2) the February 2012 functional assessment was not consistent with Dr. Pabilonia's clinical findings.

The ALJ properly gave little to no weight to the February 2012 assessment because the February 2012 assessment is: (1) based on subjective complaints made by G.J.S.'s mother and on limited observation by Dr. Pabilonia; and (2) inconsistent with Dr. Pabilonia's clinical findings preceding the February 2012 assessment.

The treating source rule requires the ALJ to give controlling weight to a treating physician's opinion if that physician's opinion is well supported by medically acceptable clinical and laboratory diagnostics, and if that opinion is not inconsistent with other substantial evidence. 20 C.F.R. §§ 404; see also Shaw v. Carter, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78–79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). A treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." F.S. v. Astrue, No. 1:10CV444 (MAD), 2012 WL 514944, at *5 (N.D.N.Y. Feb. 15, 2012) (quoting Coty v. Sullivan, 793 F. Supp. 83, 85–86 (S.D.N.Y. 1992)).

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign the opinion. 20 C.F.R. § 404.1527(d)(2). These factors include:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2).

An ALJ is not required to give controlling weight to a medical source opinion that is based on a plaintiff's subjective complaints and is not well supported by substantial evidence. Baladi v. Barnhart, 33 Fed. App'x 562, 564 (2d Cir. 2002) (summary order).

Additionally, an ALJ is not required to give a physician's medical source statement controlling weight when the medical source statement conflicts with his own treatment notes. Cichocki v. Astrue, 534 Fed. App'x 71, 75 (2d Cir. 2013) (summary order); Micheli v. Astrue, 501 Fed. App'x 26, 28 (2d Cir. 2012) (summary order).

The regulations specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [Smith's] treating source's opinion. 20 C.F.R. § 404.1527(d)(2)); See also Schaal v. Apfel, 134 F.3d 501, 503–04 (2d Cir. 1998).

Here, the ALJ correctly gave little to no controlling weight to the February 2012 assessment because the assessment: (1) was based on subjective complaints; and (2) conflicted with Dr. Pabilonia's own treatment notes. When discussing the February 2012 assessment, the ALJ establishes that the medical source treatment was based upon subjective complaints by G.J.S.'s mother, as opposed to the medical opinion of Dr. Pabilonia. The ALJ states:

> On February 1, 2012, a medical statement prepared for the claimant's representative was submitted under the stamp of Dr. Pabilonia, but without his signature. (Exhibit 17F, p. 5

[430.]) . . . Whoever filled out the form on Dr. Pabilonia's behalf added only that "Ct is very hyper, distracted and do [sic] not follow rules at home or school. Ct is disruptive, mouth and do [sic] not listen to mother and authority figures." (Exhibit 17F, p. 5 [430.]) These comments clearly appear to be reports taken from the claimant's mother, rather than considered medical opinion based on the multiple treatment reports Dr. Pabilonia in fact signed earlier (Compare with Exhibit 13 F, pp. 4 [383], 5 [384], 7 [385], 8 [386] and especially 12 [391]).

[35.]

As evident from the preceding statement, the ALJ clearly considered and explained that opinion expressed in the February 2012 assessment was from Smith, and not from Dr. Pablionia himself. The assessment's composition of subjective complaints taken from Smith supports the ALJ's conclusion that little to no weight be given to the assessment.

The ALJ also establishes that the medical source statement provided by Dr. Pabilonia's office conflicted with Dr. Pabilonia's own treatment notes from prior appointments in which Dr. Pabilonia examined and treated G.J.S. The ALJ states:

> I give this report very little if any weight in this decision, as it clearly is based on the claimant's mother's statements and very limited observation by Dr. Pabilonia. In fact, Dr. Pabilonia's reports, already considered above, starkly contrasts with the word circling and one poorly worded comment given on this form, one clearly created for purposes of pursuing child's Supplemental Security Income benefits for the claimant. Rather, I give much greater weight to Dr. Pabilonia's reports which show the claimant doing well on medication, polite, pleasant and cooperative. (Exhibit 13F, pp. 4 [383], 5 [384] and 12 [391]) These reports were actually made by Dr. Pabilonia himself and clearly reflect the actual state of the claimant based on Dr. Pabilonia's observation and profession evaluation, rather than on comments made by the claimant's mother or others.

[35.]

The ALJ further states:

> I also give much greater weight to reports made by the claimant's teachers, who are trained in childhood education and behavior patterns and who spend long periods of time with the claimant. They reflect a decidedly more positive view of the claimant and her actual behavior and abilities than the February 1, 2012, report from Dr. Pabilonia's office. The claimant's report card reflects she is having some difficulty with math, but that her grade point average overall is 82.2. According to the grade key on her report card, this number reflects her performing on the low side of "outstanding." (Exhibit 17E, p. 2 [213.]) The claimant is doing B or A work in science, social studies, physical education, music, and art. While it is true that the claimant needs some work on showing

respect to others, it is also reported she is a pleasure to have in class and that she participates regularly. (Exhibit 17E [212−15.]) [35−36.]

The ALJ fully established and thoroughly explained that the February 2012 assessment conflicts with Dr. Pabilonia's prior treatment notes, and how this internal inconsistency factored into his decision to decline G.J.S.'s SSI benefits. [390−91.] The record reveals at least eleven signatures from Dr. Pabilonia that are attached to his clinical notes from February 28, 2011 to December 13, 2011. The notes show that, in Dr. Pabilonia's contemporaneous opinion, G.J.S. was doing relatively well. In contrast, the unsigned February 2012 report was completed last, reflects no direct observation of G.J.S., and was prepared only days before the hearing. As the ALJ provided "good reasons" for giving little to no controlling weight to the February 2012 report, the ALJ is not required to give controlling weight the February 2012 assessment.

In sum, substantial evidence supports the ALJ's treatment of Dr. Pabilonia's unsigned medical report.

**The ALJ did not elevate his own "lay judgment" over that of Dr. Pabilonia and over both of G.J.S.'s teachers when he concluded that G.J.S. did not have an extreme impairment in attending and completing tasks.**

Smith argues that the ALJ elevated his own lay judgment over that of Dr. Pabilonia and over that of G.J.S.'s teachers when deciding G.J.S. did not have extreme impairment in attending and completing tasks. The Commissioner counters that Smith's last argument that the ALJ substituted his lay opinion for that of Dr. Pabilonia is essentially the same as arguing that the ALJ erred by giving Dr. Pabilonia's argument little weight.

This last argument is essentially a restatement of the preceding argument, that the ALJ erred by giving Dr. Pabilonia's opinions little weight. As explained above, the ALJ gave good

reason for giving the February 2012 assessment little to no weight. [35.] Further, the ALJ more than sufficiently considered the teacher assessments in his decision.

Substantial evidence supports the manner in which the ALJ weighed various reports in the record.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the Smith's motion (Docket No. 8) for relief be denied in whole. The Court also recommends granting the Commissioner judgment on the pleadings and closing the case, given that all issues have been argued and that the same findings that weigh against Smith simultaneously weigh in favor of the Commissioner.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report and Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report and Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**

**Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

   SO ORDERED.

          __/s Hugh B. Scott_____
          HONORABLE HUGH B. SCOTT
          UNITED STATES MAGISTRATE JUDGE
DATED: August 18, 2014